Thank you, Mr. Clerk. Good morning. Please be seated. The second case this morning is First Bankers Trust Co., Inc. v. Koke Mill Medical Associates, LLC. That's case number 4-1-7-0-2-4-2 for the appellant, Robert Baeser, and for the appellant, John Patton. Mr. Baeser, am I pronouncing that correctly? Yes, you are, Your Honor. Great. You may proceed. Thank you.  Good morning. May it please the Court. I'd like to start out by telling you something that we couldn't describe in the briefs, and that was what it was like when Judge Madonia fired Nurse DiCostanzo. Initially, they filed motions in limine. We agreed to them. They filed a new motion in limine. We agreed to it. We weren't going to have her give opinions of violations of the standard of care. They raised it again on monte. We do our openings. All of a sudden, she's in town ready to testify. We've been working on this case for three years. And all of a sudden, Judge Madonia says, no, I'm barring her. She was our first witness, or intended to be our first witness. And the feeling I had, I guess it would be like if Your Honors told me, don't bother arguing anymore because we lost. It took the wind out of me. My mouth dried out. I felt sick. And basically, we needed her. They never even requested it in their motions, and we lost a very key witness. And then, to pour salt on the wounds, they let their expert, Nurse Easterich, testify to the very same things. As we note in the brief, when the court did that, I said, Judge, we're likely to lose now. And we lost. The Iaccino case, right on point. I understand it's not this district, but it's right on point. And in those birth trauma cases, most of the books and reading scripts are written by nurses. They're the experts. They're the ones who are there observing everything, as nurses would be in this case. What's a complication? Is it normal to be breathing when the baby's born? Is it normal to have hypoglycemia? Is it normal not to eat? It's those nurses that are there all the time. So, it took the heart out of our case, and we certainly have pointed out in the briefs that it cost us the case. I want to address the res judicata issue. First of all, it isn't claim splitting. Claim splitting, res judicata, requires that the parties be the same or they're privies. They clearly are not here. It can't be an issue that they are. They're not. And the basis of those cases is harassment of the defendant, that they shouldn't be required to keep defending the same case. And that didn't apply here. If your honors believe that res judicata would apply here, which it doesn't, there are some exceptions to it. And one exception is that it shouldn't be applied if it's unfair to a plaintiff. The insurance issue in this case is not an insignificant issue. When we start a case, we send out interrogatories, and we get answers. There's $1 million for Coquimel, and there's $26 million for the hospital. Who are we going to point at? Who are we going to do focus groups for? Why do we bring in an AT&T person to testify about a nine-minute phone call with the hospital? All of a sudden, after three years or so, we find out two weeks before trial, oops, there's an extra $25 million that we forgot about. So here we are, and for three years, I'm telling our people, all that matters is this phone call. Worst thing that can happen is that we get Coquimel and not the hospital. So we non-suited the hospital. Excuse me. We non-suited Coquimel, and we went forward with the hospital. We did that because of the misrepresentation in their interrogatories regarding insurance. We are entitled to rely on those. Our whole tort system depends on truthfulness. And if your honors feel that claim splitting is an issue, that's an exception that we felt we were forced into it. To do otherwise, they would have no consequences for misrepresenting a critical element in the case. You know, in their briefs, they mention, well, we could have non-suited both cases. And I wish I could have hindsight for a lot of things in my life. You know, if I knew, I can tell you that we would have 400,000 reasons. Why I wish we had non-suited both cases, but we didn't. And we didn't have to. Monday morning quarterbacking doesn't count. The issue that your honors might be thinking about is, well, judicial economy. And I would concede that it makes sense to try cases involving the same injury together. But I would also tell you that no plaintiff's lawyer in his right mind would purposely separate cases and keep an empty chair in both of the cases, spend an enormous amount of time on one case, spend enormous amounts of money to try to get separate cases. He just wouldn't do it. We didn't do it until we found out the truth about the insurance. And if judicial economy is the issue, there's legislative fixes. There's Supreme Court rules fixes. You know, in Illinois, we don't even have a rule for compulsory counterclaims like they do in federal rules. So you could try a case within the Illinois rules and come back later and try the counterclaim. I think that the judicial economy is not the issue. It's not the issue with res judicata in the cases in Illinois. The chain of command question, we weren't going to raise that. You know, throughout this is interesting. I agree. But it reminds me of a round wooden table in a saloon where lawyers get together and talk about what could have happened, what should have happened, what I wish would have happened. I still don't know, other than from the briefs, what it is that you're getting at. Now, maybe that's because I'm dull. But I want to know where you're going. Well, I'm just responding to the res judicata argument. I understand. Where we're going is that we feel we were totally denied a fair trial because of nurse de costanza. That's why we lost the case. But the only thing I've heard about that so far is that you were surprised when, in fact, that was a contested issue all the way through the preliminary stages of getting ready for trial. I mean, the judge at one point says, I'll come back and review this again. I understand. It wasn't a contested issue. She was our 213 expert. I mean contested in the sense that there was a lot of discussion and debate about what she was going to get to testify to and or whether she was going to get to testify, but what she was going to get to testify to. She had a list of complications. She was going to testify that it is a complication when a baby is born not breathing. That it's a complication when a baby is born and requires two and a half minutes of resuscitation. That it's a complication when a newborn has hypoglycemia. That it's a complication when a baby doesn't eat for 12 hours. Their nurse testified essentially that everything was okay. That's why we, and we never said she wasn't going to testify to that. Well, we said she wasn't going to testify to the standard of care for a doctor or that any nurses violated the standard of care. I made that clear from, by not objecting to the initial motion in limine. She was not going, I know the rules, and if counsel or the court were suspicious of me that I was going to be sneaky and do it anyway, judges can prevent that during a trial. They can declare a mistrial, but I had no intention of doing that. It wasn't our plan. But it was certainly our plan all along to have her testify that these things are complications. And if they're complications, we had doctors testifying that under the policies of the American Academy of Pediatrics, babies stay in the hospital for 48 hours unless it's uncomplicated. If it's routine, if it's normal, go home. But if there's anything wrong, they stay in. And nurses are on the front line and much more experienced than a pediatrician, and they're there to tell you that there's something wrong. The indication that something is a complication, do you consider that an opinion? Whether a baby's course is normal or uncomplicated or complicated? Sure. Do you consider it an opinion that's within the scope of a nurse's knowledge and experience? For sure. I took it from the record that your intention was to call the nurse practitioner first, then have Dr. Schleiss come in and explain why all these complications were significant. Well, no, Dr. Schleiss didn't testify about a complicated course. He testified about what are signs of infection. Dr. Marin from Boston was going to testify that with these complications, a baby is required to stay for 48 hours. So we had two witnesses essentially on complications with Nurse DiCasanzo, and they had five, including a nurse. And a very persuasive nurse who had worked at this hospital for 35 years. She was going to say, well, everything was okay. She didn't treat the baby, she only discharged him. So everything she was testifying to was based on the same record review that Nurse DiCasanzo was going to testify about. And the jury felt that this was no big deal. There were five witnesses saying that babies wake up not breathing a lot. They have hypoglycemia a lot. It's not a big deal, because on discharge, the baby looked fine. And that's where Nurse DiCasanzo, with $40,000, $50,000, $100,000, $100,000, $100,000, $100,000, $100,000, $100,000, $100,000, $100,000, $100,000, $100,000, $100,000, $100,000, $100,000, $100,000, $100,000, $100,000, $100,000, $100,000, $100,000. And so did Nurse Easterright. We were denied a totally competent witness, and that cost us the trial. You're contending in your argument that our standard of review is de novo. Well, we didn't contend it, I don't think. If Judge Madonia made his ruling based on a misperception of the law, in other words, that there can be a backdoor opinion, then we suggest that it might be de novo. But I don't think it matters what it is. It's an abuse of discretion to deny us a totally competent expert, a persuasive expert, with no basis. The difference was one was a 213-F2 and the other was a 213-F3. Well, that's what counsel suggests, but they're both experts. There's no difference in law that we found that an F2 witness can testify about something that an F3 witness can't testify about. They're both experts. Nurse practitioner, is it Easterright? Easterright was Cokie Mills' witness. Other than discharge, did she have anything to do with the child? No, nothing. Did she even recall this particular discharge? No. Her testimony as I took it was basically, this is what my records say, this is what the notes were, so therefore this is what must have happened. Yes, Ron. But the trial court references direct contact between Easterright and the child and the parents and actually sees the child before discharge. At discharge. The last one to see the child. Yes. And partly on that basis he distinguishes between your witness and this nurse. Apparently solely on that basis, but she only testified and only saw, if at all, the chart when she discharged. Did she see the child? We weren't disputing that the child looked okay at discharge. So that distinction, which the judge made, is at the core of what you're suggesting is wrong. That's what the abuse of discretion is. Because that's what prompted him to decide she shouldn't be able to testify. Well, I don't know that that's what prompted him to allow her. That she was a treater. And she went into things that she does when she treats babies. How she does rounds, how she does all these things. And all she did here, look, a nurse comes in, the doctor has cleared the baby for discharge. And a nurse comes in, and it's a happy occasion. And they teach the parents how to, you know, do the two minutes. On cross-examination, did you get to bring out all of the various issues that you were intending to bring out through decostensis? On cross-examination? I wasn't precluded from bringing out what I wanted to bring out. From Asteroid, she just disagreed. Okay, but my question is, you got to bring out each of the issues that decostensis was going to testify about on cross of Asteroid. But she disagreed with what nurse decostensis would have said. Did you then have one of your follow-up experts going through the fellow from Massachusetts? A woman, Dr. Merritt. She was the only expert in the case, for us, that talked about complications. And they had five. So, if there's no further questions... Counsel, I don't see any, but you will have rebuttal. Sure. Mr. Patton, thank you. Good morning. Mr. Baser is an excellent lawyer. Very experienced in trying these kind of cases. And he put on a very aggressive, hard-fought case on behalf of his clients. Every witness, they challenged on everything that they could. He was not deprived of a fair trial, because nurse decostensis was fired by Judge Madonia to talk about the standard of care of Dr. Baskin's cells. The key, unnamed, but the key person in this case. Well, I think he said that she was his only expert to talk about complications. What's your response to that? That's flat-out wrong. Flat-out wrong. Mr. Baser, in fact, had four experts in this case. Four. The three that you have addressed, Dr. Marin, Dr. Schweiss, and Dr. Martin, were retained experts by the plaintiffs. Gone out, found them, hired them, retained them, paid them, and they came in. And they went over that chart tooth and nail. It was cumulative. They were even objected to that. Three doctors, pediatric and infectious disease doctors, going over every single entry and identifying what was either a complication, or, as Mr. Baser said, with respect to Dr. Schweiss, the infectious disease expert, signs of infection. Signs of infection is the same word for complications. Let's remember that the word complications, standing in and of itself, means nothing. But in a medical malpractice case, under the American Academy of Pediatric Physicians, there are guidelines, published guidelines. In fact, one of their experts was the author of those published guidelines, Dr. Martin. And they came in. And so when you say the word complications, it's not, oh, you know, they have some pain, or they're still bleeding. The word complications, in this particular case, discharging the issue, did we discharge DJ too early? In the guidelines, the word complications is in there. And it's in there to state if there's complications, you don't discharge the baby earlier than 48 hours. So let's be clear, it's not a nurse, nurse Deacon Stanza, just going through the chart and saying, this doesn't look good, or this doesn't look good. She was using, and would have used, she used it in Sybil's one, so we knew exactly what she was going to say in our case, in the chain of command case. She was an expert in that case, and faulted all the nurses for missing all these complications. Of course, the court directed that claim on, and I'll address that later on my race to the cot argument. But make no mistake about what the plaintiff's true motive was. And it came out, unfortunately, by Mr. Basar. The true motive was, let's get this nurse expert to come in, testify to all the complications, and backdoor the standard of care opinion that if a nurse can recognize reasons to keep a baby in the hospital, surely Dr. Vasconcells should have come to that conclusion. That was the standard of care opinion that Judge Madonia was very, very concerned about. They already had four physician experts come in and talk about those issues, and fault Dr. Vasconcells. It was overwhelming, adding Nurse DiCostanza, even if somehow they can make an argument she should have testified, they weren't harmed, prejudiced in any way with having physicians come in and attack the standard of care for Dr. Vasconcells. But that was the concern. And the case that they cite, the E.O. Cheney case, it struck me on point for us. The court in that case, dealing with a nurse just like Nurse Estreich, a treating nurse in the case, was allowed to testify to the entries in her chart, but she wasn't allowed to say anything in that trial that could be used to be inferred to be a standard of care argument against the obstetrician in that particular case. And so make no mistake about this, Mr. Basar said it. I'm not, his words were, I was there, I was standing right there when he said it, I got the view of what Judge Madonia's reaction was, and believe me, when he said, oh boy, that doesn't describe his demeanor, rocked back in his chair, his eyes opened up, because there was the revelation by Mr. Basar. We're going to put her on, we're going to talk about complications, complications, complications, we won't use the word standard of care, but we're hoping the jury is going to interpret what Nurse DiCostanza testifies to as a criticism of Dr. Vasconcells. I'm just trying to figure out what's wrong with that, because why wouldn't you have a foundational witness testifying as the basis for the people who are qualified to render the opinions? Why isn't that fair game? I still have a hard time figuring out what was wrong with the process. A witness testifies to complications, which no one seems to contend are medical opinions related to standard of care directly, and of course a plaintiff would want the jury to then make the connection between the testimony of the foundational witness and the expert to the ultimate conclusion they want. The term complications is a term involving standard of care, that's the difference. Ultimately, but not as it's presented, it's a complication. That's why I try to distinguish that, Judge, in my earlier comments. It's not just an innocent term. The word complications is directly synonymous with standard of care of whether the baby stays or the baby goes. If the facts were that they kept the baby for 48 hours, if the facts were that they had done everything proper, you're telling me that all of these facts that existed wouldn't have been considered complications? If they did everything right and there was no lawsuit, those facts wouldn't still be complications? They wouldn't be complications. This is the distinction, Judge. They wouldn't be complications on the issue of whether or not the discharge in position follows standard of care. I understand where you're taking it. My question, though, is those facts in and of themselves would constitute complications, wouldn't they, whether this was a lawsuit or not? They would not be complications with respect to it being a term of art for standard of care. It's hand in glove. We have guidelines. Dr. Vasconcells belongs to the AAP. Many of these physicians in this case, the one that wrote the guidelines belongs to the AAP. It wrote the guidelines for the AAP. The word complications is distinct and unique for a physician in making the decision whether or not to discharge the baby before 48 hours. So every time an expert comes in, and she was being presented as an expert, let's be clear on that, an F3 expert, her uttering the words complications was telling the jury violation of the American Academy of Pediatric Physicians guidelines. Only when it's tied up with an expert witness who's qualified to testify so. Well, they had three physicians that were tying it up. Three physicians. It was overwhelming. The point being, Madonia saw, in terms of the sequencing of the witnesses, a doctor says, I went through the chart and I found all these complications. Not innocent actions or behavior on the part of the baby. Complications that violated these guidelines. Then you get a nurse expert to come in and she testifies and so did I. I'm just a nurse and I knew these were complications not to discharge a baby early. Surely Dr. Vasconcells could have figured that out. So if you take a witness out of order, that now makes that witness's testimony inadmissible. Because that kind of looks like what the trial judge here, if she would have testified first, it would have been foundational. But now that Shlyce has testified, the judge has decided, oh, this is a way to backdoor it. So if it would have been the reverse, then that would have been okay? Now, let's remember the only defendant in this case, the only individual in this case that was being accused of wrongdoing, violating the standard of care, was who? A physician. So what was the purpose? They already tried their case against the nurses in the previous case and lost. So nurse deconstanza could not come in. Remember, all these notes for complications, those primarily are coming from nurses. So what was the probative value of nurse deconstanza if the case wasn't against the nurses? What was the probative value? You can't have a foundation judge by a nurse who doesn't have the qualifications of a physician. That's the nurse violating the rule of law in this state that you can't have a nurse criticizing the conduct of a doctor. And Judge Madonia, exercising his discretion, saw exactly what they were doing. And if I can't convince you of that, in the record, you see Mr. Basar saying, this is what I wanted to accomplish out of nurse deconstanza. Not foundation. That's not what he was saying. He was saying, I want this jury to look at this expert nurse and interpret her testimony to be a criticism of Dr. Baskin-Sells. I understand your argument about foundation, sure, but they didn't need to lay a foundation with the nurse. The doctors laid the foundation. You had the physician that wrote the guidelines for complications testify as their expert in this case. They didn't need a foundation. And if they wanted a foundation, they could have called the nurses that wrote those notes in the chart. Including Nurse Aistreich, who we called. So Judge Madonia had this exactly right. What was going to happen. And then they got to call all of their experts, physicians, to go over that chart in detail about complications. Nurse deconstanza would not have added anything if they didn't make the argument, I want you to infer her testimony to be criticisms of Dr. Baskin-Sells. The other concern, obviously, was she was, by her testimony, the jury would interpret the nurses were negligent. That was her retention, the purpose of her retention in civils one. Not the nurses for missing all these complications. But here was the concern. If the nurses were negligent, shouldn't Dr. Baskin-Sells have recognized that? So it was a double risk of having evidence that didn't belong in this case be interpreted to be a violation of the standard of care on behalf of Dr. Baskin-Sells. Unless there's any more questions on Dr. Baskin-Sells, they didn't mention one of their arguments with Dr. Shulman. Since I don't get rebuttal, I should probably talk about it now. I'm not sure what their claim is with respect to Dr. Shulman. They don't seem to say that that impacted this case whatsoever. But I know you all had an opportunity to review the record and the attack on Dr. Shulman, I'm not criticizing the attack, was so aggressive and so prolonged that even Judge Madonia had to say, okay, enough's enough, you're turning this into a trial in and of itself. The fact that his board certification in pediatric infectious disease may have lapsed or wasn't renewed. And then you saw, it probably didn't help though when he said that he suddenly has the surgery right at the beginning of the trial, or right at that stage of the trial where there's already been one expert to testify and says, oh, I'm going to be bedridden for two weeks at least. And then you get the doctor off the phone who actually did the surgery. I didn't tell you that. I got a note here. Dea Costanza was actually barred after the doctors testified in Civils I. She wasn't the first one. With respect to the foundation, the foundation had already been laid by three professional experts. With respect to Dr. Shulman, I don't know what was going on there. I know that if I had an obstruction of the bowel and it was emergency surgery, I'm not sure that I'd want to then jump in a car, come to a trial and testify. But having said that, Judge Madonia got the surgeon on the phone and allowed Mr. Baser to cross-examine him live over the phone as to whether or not this was the type of surgery that would incapacitate anyone, let alone an elderly doctor, to testify. But I don't think they're really raising that issue. I think it's the issue of this attack. And all I can tell you is the jury is the one that determines issues of credibility. And they got to raise all of the issues. They told the jury in rebuttal that Dr. Shulman deliberately falsified his documents, his resume, with the motive to seek more business. I mean, I read that last night and I must have been focused on something else. I should have objected to that. Because even Judge Madonia said in a post-trial hearing, I was there, I watched his reaction, and it was a mistake. They got to argue it was deliberate, intentional, to make money. And the jury had a chance to assess all of that. And obviously we know what their findings were. So the issue with respect to Dr. Shulman had nothing to do with the outcome of this case. I know my time is waning. Just some quick comments on this raised judicata. Civils 1 was a chain of command case. Counsel said, I don't want empty chairs. I'm not claim splitting. There was a chair in that courtroom. And that chair was empty, but it was Dr. Baskin-Sells. Their case on the chain of command, their proofs, had to show that Dr. Baskin-Sells was negligent in making the decision to discharge D.J. And the nurses should have recognized that they had to go over Dr. Baskin-Sells' head to somebody above her. So we attached the transcript of the hearing when we initially filed the motion to dismiss, when they filed the case against Cokie. And you see Mr. Baser telling the court during the motion for directed verdict in Civils 1 that their case was showing that Dr. Baskin-Sells violated the standard of care. That Dr. Jill Marin, the same doctor in our case, testified in the first case against the Memorial Medical Center. And their whole case was showing to the jury, trying to prove to the jury that Dr. Baskin-Sells violated the standard of care. And so the court in that case directed a verdict. They failed to prove their case at that point. That's identical to the case that we tried. Dr. Baskin-Sells was negligent in her decision to discharge D.J. early. I think it should have been collaterally stopped or raised judicata, whether issue preclusion or the cause of action was the same. But Dr. Baskin-Sells was absolutely a target in Civils 1. They tell you that they non-suited the case because of money. Mr. Patton, you are out of time. Is there any rebuttal? You start with the chain of command. There was no testimony in what they call Civils 1 about Dr. Baskin-Sells violating the standard of care. It didn't come in. If it had come in, a verdict against us for that could mean various things. It could mean that the nurses didn't need to use the chain of command. It could have meant that even if they used the chain of command and even if Baskin-Sells violated the standard of care, there was no causal connection. But the point is there was no finding at all that Dr. Baskin-Sells did not violate the standard of care. It's not collateral estoppel. With respect to the witnesses on complications, counsel accused me of misleading the court. We have one witness from the chart on complications. That was Dr. Marin, one. Dr. Martin was an author of the practice guidelines. He testified hypothetically. He didn't make one reference to this chart, but he testified hypothetically about whether certain things like not breathing can be a complication. But he testified about the principles. Dr. Schleiss was a causation witness. He testified about signs of infection primarily that developed after discharge. He did not use the word complication. He didn't testify about it. Dr. Marin was our only, only complication witness in this case. My motives were impugned throughout the trial as they just were here. In our brief, we made it clear, and they referred to this throughout their brief, put it in boldface, that she was not going to testify that the baby shouldn't have been discharged. That was not what her testimony was. And I said the jury maybe can draw that conclusion that she shouldn't have been discharged at the end of the case, and I hope they do. It was a foundational witness. She was an F3 opinion witness. They had an F2 opinion witness. And the jury had to wonder, well, we couldn't find a nurse anywhere in the world to talk about complications when they found one who actually was there. But we had a nurse. We couldn't call nurses who treated her at the hospital to say that there were complications,  I guess for that same reason we could have just called doctors that treated her. Could have called Vasconcell's partner. Dr. Shulman lied to get the mistrial. It wasn't at the beginning of the trial, Your Honor. It was at the end of our case. We had expended enormous sums of money, and he couldn't get out of bed five days later, eight days later, to give an evidence deposition. Then he lied in court. He knew he was not board certified. He knew it, because we had list serves come in handy. We had provided all the information to somebody taking his deposition two weeks before or three weeks before. So he knew all that stuff. Then he lied, and then it appeared that we were picking on this old guy for not paying his dues, as counsel said in his closing. They were laughing at us, a couple of the jurors. A material witness who lies, and he was a material witness, is in enough grounds for a new trial, and he lied about board certification. Then he admitted that he wasn't board certified in another deposition two weeks later. Nurse Easterich was allowed to testify, and in the brief, what we did, we substituted, Your Honor, what the court said about Nurse DeCostanza. We just put her name in instead and changed it. I'm convinced that her testimony is designed to provide backdoor support. That was Nurse Easterich. She's there to testify that nothing went wrong. We just took his words and put in Nurse Easterich. She testified about the opposite. Thank you.